**EATON et al. v. HUSTED et al.**

No. 5945.

Court of Civil Appeals of Texas. Texarkana.

June 15, 1942.

Rehearing Denied June 25, 1942.

Brachfield & Wolfe, Frank C. Bolton, and Gordon R. Wellborn, all of Henderson, and Joseph A. Seymour, of Midland, for appellants.

Clower & Wilson, J. V. Fleming, and Potter & Bezoni, all of Tyler, for appellees.

WILLIAMS, Justice.

J. L. Eaton, trustee, Herbert Eaton and others, children and widow of Geo. W. Eaton, Jr.; Rubye Somerford and others, the heirs of Exa Woodall; and Vera Sartin and others, the heirs of Ida Sartin, were named defendants in this suit by Lee Dell Husted, joined by her husband, wherein Lee Dell sought to impress a trust, not in writing, in her favor upon 13 tracts of land now held by the Geo. W. Eaton, Jr., heirs. The Woodall and Sartin heirs, in their cross action against the Geo. W. Eaton, Jr., heirs, adopted Lee Dell's allegations and sought to impress a trust in their favor upon an interest in the same lands. The Geo. W. Eaton heirs answered by general demurrer, denial, and various limitation statutes.

Upon jury findings, the court awarded Lee Dell a recovery against the eight children of Geo. W. Eaton, Jr., for a 1/8 undivided interest in tracts Nos. 1 and 4, with a money judgment against them representing a similar interest in the oil proceeds from above two tracts, and denied a recovery against J. L. Eaton, trustee, and Martha Rhodes, the widow of Geo. W. Eaton, Jr. The children have appealed, and will be referred to as defendants. During trial certain tracts were dismissed out of the suit. The court granted in part a motion to enter judgment non obstante veredicto and denied a recovery as to tract No. 6 and others. In a cross assignment of error Lee Dell complains of the action of the court as to tract No. 6. The Wood-

all-Sartin heirs were denied a recovery and they have appealed, and will herein be styled cross-plaintiffs. The observations to follow will be confined to tracts Nos. 1 and 4.

Geo. W. Eaton, Jr., Exa Woodall, W. A. Eaton, J. L. Eaton, Bob Eaton and Effie Eaton, the mother of Lee Dell, plaintiff herein, were the six children of Geo. W. Eaton, Sr., and Lou, his surviving wife. Ida Sartin was one of seven children of Geo. W. Eaton, Sr., and his first wife. He died in 1889, leaving a sizeable estate, largely a community with Lou, who qualified as community administrator. Effie Eaton died in 1904; Lou, February 12, 1908; Geo. W. Eaton, Jr., on February 22, 1937; and Bob, who never married, died subsequent to his mother's death.

Plaintiff alleged that in December 1907, Lou conveyed and delivered over to Geo. W. Eaton, Jr., certain lands, insurance, bills receivable and other personal property, under an express agreement, not in writing, between Lou and Geo. W. Eaton, Jr., that the latter would take over and manage the estate of Lou and the interest of plaintiff as inherited by plaintiff from and through her mother and grandfather, for the benefit of the said Lou Eaton during her lifetime and at her death for this plaintiff until plaintiff attained the age of 21, with the right to sell and convey and reinvest the proceeds of the sale of any of the property or the collection of the notes, and to manage the same for the benefit of this plaintiff until she reached the age of 21 years; and that Geo. W. Eaton, Jr., "accepted such property subject to such trust agreement." In the alternative, plaintiff alleged that "if she be mistaken that said express trust covered * * * all the properties * * * turned over to Geo. W. Eaton, Jr.," by Lou, that then said express trust was to an undivided ⅕ interest to which plaintiff was entitled as an heir of Lou and Geo. W. Eaton, Sr., or such interest as plaintiff would have inherited under the laws of descent and distribution. Plaintiff further alleged: " * * * that the said Geo. W. Eaton handled such trust funds and properties in his own name and all proceeds, exchanges, purchases, and sales were made in his own name; all funds both his separate and those belonging to the trust estate were used inexchangeably and commingled one with the other to the extent that it is now impossible for this plaintiff to trace or allege the exact por-

tion or amount of the trust fund so used in the purchase of the property which the said Geo. W. Eaton, Jr. died seized and possessed; for which reason all of the property owned by the said Eaton, Jr., at the time of his death were and are now impressed with the express trust in favor of plaintiffs; or in the alternative, such property is impressed with an express trust in favor of this plaintiff in the proportion to which this plaintiff is entitled under the law of descent and distribution. * * * And that by mutation of said properties and investment of said trust funds the following lands constituted a portion of said trust estate in which she owns the whole of such title, or in the alternative, an undivided ⅕ interest as the sole heir of her mother."

Mrs. Lou Eaton conveyed to Geo. W. Eaton, Jr., her son, under a deed dated December 17, 1907, her homeplace consisting of one acre and residence thereon situated in Old London, Rusk County; and under deed dated December 21, 1907, she conveyed to him her undivided ½ interest and "two shares" in a 240-acre tract, styled the Irwin tract. Each deed recites consideration of $1 and love and affection, and contains general warranty of title. Under a bill of sale dated December 21, 1907, which recites a consideration "for value received" she conveyed to him one piano, her entire interest in her deceased son's, Jeff L. Eaton's estate then in the control of A. P. Finney, all her household and kitchen furniture of all sorts and all her promissory notes, listing the respective amounts and maker of each. The three instruments were filed for record February 22, 1908. Lou Eaton also changed the beneficiary in a $1,000 life insurance policy to this son. The judgment entered for ⅛ of ¾ or a ⅛ undivided interest, the evidence introduced, and issues submitted reflect that litigants treated the properties turned over to George Eaton as being the separate property of Lou at the time she transferred same.

The jury found that the proceeds of this insurance was not intended to become the separate property of Geo. W. Eaton, Jr. In response to issues Nos. 39, 40 and 41, the jury found that the properties were not conveyed upon the consideration that he pay all her expenses and support her during the remainder of her life; that at the time Lou Eaton executed and delivered the above-mentioned instrument and made the

change of beneficiary to her son, it was understood and agreed by and between Lou Eaton and George Eaton as a part of the consideration therefor that the interest which the plaintiff would have become entitled to in the property thereby conveyed as an heir of Lou Eaton, upon her death, would be held and managed by George Eaton for plaintiff until she arrived at the age of 21 years, at which time he would deliver to plaintiff said interest or the proceeds, rents and revenues derived therefrom; and that it was agreed that as a part of the consideration whatever remained of the property conveyed by said instruments at the time of the death of Lou Eaton would be held by George Eaton for the benefit of the children and grandchildren of Lou and Geo. W. Eaton, Sr.

In response to issues Nos. 6, 8, 17, 19 and 43, the jury found that tract No. 4, the Forbes tract, was not purchased with individual money of George Eaton, Jr., and his wife; that tract No. 4, tract No. 1, known as the Estes tract, and tract No. 6, known as the Cooper tract, were each paid for in part by the use and investments of the proceeds of property, or from the increase thereof, which was held by George Eaton in trust; and to issues Nos. 7, 9, 18, 20 and 45, that 75% of the consideration paid for each tract was paid for by the proceeds from, or the increase from the property so held in trust; and that no portion of the property of Mrs. Lou Eaton was given to plaintiff or to some person for her at the time she was moved to the home of her half-aunt.

The first ten points attack the sufficiency of the evidence to support the jury findings. It is contended that the evidence "being based upon surmise and speculation" and "not being clear, satisfactory and convincing," is insufficient, as a matter of law, to support the alleged express trust resting in parol. In connection with above, it is asserted further that (a) "No trust was created because of failure to show assent by the owner of the property; (b) the agreement was testamentary in character; and (c) the property was conveyed upon agreement that George Eaton support his mother the remainder of her life. Such evidence which, in our opinion, tends to support the jury findings will be briefly detailed." 41 T.J. 949, Sec. 177; 3 T.J. 1059, Sec. 747.

Effie Eaton, aged nine at her father's death, and who never married, lived in the home of Lou, her mother, until the former's death in 1904. Lee Dell, born to Effie out of wedlock in 1901 or 1902, continued to live with Lou until November or December 1907, when Lou, having become feeble and infirm, went to live in the home of George Eaton, and Lee Dell was placed in the home of her relative. Lou died shortly afterwards. Later, Lee Dell, during her teens, went to Dallas to make her home with a relative, and then to Louisiana where she married. After marriage in 1922, she moved to California where she was living when a radio newscast of the explosion of the schoolhouse at New London, the locale of her childhood, caused her to make inquiry in March 1937 of the sheriff of Gregg County about the Eaton family. Shortly thereafter this suit was filed. George Eaton died a short time prior to the explosion.

In November 1907, George Eaton and other children of Lou, held a conference with Lou in her home to discuss means of caring for Lou. In this conference, according to the testimony of W. A. Eaton, a brother of George and an uncle of plaintiff, "George agreed to take my mother in his home and care for her the rest of her days. * * * He was to take the property over for her and look after it for her. * * * He was to have charge of the property and run it as his own. * * * Yes, Mother wanted—she said that her whole soul and heart was in the child and she wanted to know she would be cared for and looked after; * * * she said she wanted Lee Dell cared for and wanted to know how they had arranged that part of it; wasn't going to give her up unless she knew she would be cared for; * * * she wanted Lee Dell seen after and her part of the estate was to be cared for, and when she became of age she was to get her part of the estate, that was the agreement. * * * George was to look after the estate and look after hers like he did the rest of it. The agreement embraced all her property. It would be divided among the heirs if there was anything left over after her death. George assented to that and agreed to carry out that arrangement." W. A. Eaton further testified that in a conference with George about a month prior to his death in respect to the whereabouts of Lee Dell, George remarked that he "would like to know where Lee Dell was and that he would like to make a settlement with her and get shed of that part of the estate, get it off his hands." Ac-

cording to other witnesses, George remarked to them that he had made settlement with Bob and W. A., with the children who were of age; that "his mother had turned this over to take care of the balance and he was to settle with Lee Dell for her part when she became of age."

Elderly neighbors described Lou's interest in Lee Dell, namely: "Lou worried about the future of Lee Dell"; "That kid was her life." They quoted Lou as remarking, "They had ostracized her on account of the kid"; "When I pass out I want Lee Dell to have her part in my part, to have what she had when she died"; "Was going to fix things so Lee Dell would get her mother's part, that she had settled with both groups of children, except Bob and Effie."

The then local secretary of the Knights and Ladies of Honor, an insurance organization now long defunct, who called at Lou's home, testified that Lou changed the beneficiary in this policy of $1,000 on her life to George Eaton. The following is the only evidence in respect to date of change in beneficiary and was given by the secretary: "George and Lou and a little girl was in the room at the time." "Q. Was that change in the beneficiary a short time prior to the death of Lou? A. Just what time in 1907 it was, I don't recall the month, and then I understand she died in 1908, but just what month I don't know." "Q. But she did move to the home of George Eaton shortly after that change in the beneficiary was made? A. That was my impression." Mrs. Eaton testified that in the meeting held when they took Lou to the former's home, Lou stated she was going to give him the pension money and her policy to take care of her.

■ Although the testimony is silent in respect to any declaration made at the time the instruments and change of beneficiary were executed, the declarations thereafter made by George Eaton that he was holding the property for Lee Dell until she became of age is corroborative of the positive and direct testimony given by W. A. Eaton that such a trust agreement was entered into between Lou and George. This testimony taken in connection with the expressed wishes of this grandmother, her devotion for this grandchild, the latter's age at the time, their home life and this act of turning over to her son all her property and possessions under such circumstances, presented more than a surmise or speculation that an express trust, resting in parol, was created and would not have authorized a preemptory instruction in favor of the George Eaton heirs on this issue. Bogert's Trusts and Trustees, Vol. 1, §§ 45, 50, 66, pp. 197, 241 and 269; Perry on Trusts, Secs. 39 and 137; Smalley v. Paine, 62 Tex.Civ.App. 52, 130 S.W. 739, and authorities cited and discussed on page 742; Howard v. Zimpelman, Tex. Sup., 14 S.W. 59; Bennett v. McKrell, 135 Tex. 557, 144 S.W.2d 242; Articles 3713, Rules 26, 33, R.C.S. of 1925; Hambleton v. Southwest Texas Baptist Hospital, Tex. Civ.App., 172 S.W. 574; 42 T.J. p. 611, Sec. 16, p. 617.

■ It is asserted that Lou Eaton had no interest in the proceeds of the policy of insurance, and its proceeds could not become any part of the alleged trust. This is overruled. Dunn v. Second Nat'l Bank, 131 Tex. 198, 113 S.W.2d 165, 115 A.L.R. 730; Christopher v. Davis, Tex.Civ.App., 284 S.W. 253, 257.

The evidence herein set out renders unnecessary a discussion of the assignments which assert the jury's findings Nos. 39, 40 and 41 are against the overwhelming preponderance of the evidence. A fact issue was presented, and these assignments are overruled.

■ It is asserted that "the evidence showed as a matter of law that if any agreement was made, * * * it was testamentary in character, and could not be the basis for a judgment until proven in accordance with law." In the instant case, contrary to the observations noted in Unsell v. Federal Land Bank, Tex.Civ.App., 138 S.W.2d 305, the grant was to and did take effect immediately; the settlor or donor retained no control over the property; and reserved no power of revocation prior to death. The assignment is overruled. 14 T.J. p. 755; Turner v. Montgomery, Tex.Com.App., 293 S.W. 815.

The property transferred to George having been disposed of by him prior to suit, it is asserted that plaintiff failed to trace the proceeds therefrom into the lands here involved in order to engraft an express trust thereon as alleged. Eaton's tax rendition for 1906, the year prior to the alleged trust agreement, was $600. He then owned a farm, styled by witnesses "a two-horse or two-plow farm, a farmer in comfortable circumstances, plenty to eat and the kids had plenty of clothes or enough to

keep them decent and to go to school like the average farmer." His account with his bank was closed out November 9, 1907. On September 3, 1908, it was opened with a $700 deposit. February 26, 1912, Eaton purchased the Forbes or Barber 91.8 acres, paying $900 cash for it, and in 1917 he sold a part, leaving 13.67 acres styled Tract No. 4 in the judgment. On February 27, 1912, he bought five shares of bank stock. On June 28, 1912, he bought the Estes 85-acre tract for a recited consideration of $480 cash and notes for $520, and in 1931 sold a part of this, leaving 53.79 acres, styled Tract No. 1 in the judgment. The Cooper 21-acre tract, styled Tract No. 6 in the pleading, was bought in 1927 for $650 cash. Other tracts, representing cash deals of $472, $625, and $125, respectively, were purchased in 1916, 1918, and 1919. There is evidence to the effect that he purchased new farming implements and work stock shortly after his mother's death; incurred and paid $750 in funeral expenses and last illness; and sent one of his children to college in 1910.

George Eaton collected the $1,000 insurance in the fall of 1908. In the fall of 1909 he received $185 for the 1-acre tract he acquired from his mother, and a 3-acre tract he had acquired for $30 in 1896; in November 1912, $292 and two notes of $225 each for the Irwin tract; and in 1909 or 1910 he collected the Talley $105 note. A little money, amount not shown, was part of the properties turned over to him. Lou prior to her death made her living by the loan of money. The value of the bills receivable, piano and other personal property or the amount realized on same was not shown.

In respect to the funds used in the purchase of the Forbes tract, the evidence is conflicting. Young, a lodge brother, testified that Eaton buried the insurance money in a garden and later used $900 of it in the purchase of this tract. Eaton's wife testified that her husband invested the net proceeds of the insurance in hogs, most of which died. His son testified that the $900 paid represented proceeds of the 1910 and 1911 cotton crops sold just prior to the purchase. This son also claimed a team of work stock was a part of the $480 cash consideration paid on the purchase of the Estes tract. To discuss further details in respect to above transactions or set out other purchases and sales will not change the picture that Eaton mingled through the years the alleged trust funds with that of his own, without in any wise keeping or attempting to keep an account of his transactions, either of his separate funds or that of the alleged trust funds, but declaring about a month prior to his death, according to his brother's testimony, he "would like to know where Lee Dell was * * * would like to make a settlement with her and get shed of that part of the estate—get it off his hands."

In view of the evidence in respect to his acknowledgment of possession of a trust fund or estate, his financial condition prior to the creation of the trust and his purchases for cash subsequent thereto, and his commingling of the alleged trust funds with his own, it is thought that under such circumstances a case is made for tracing the trust funds into the property left at the death of the trustee. Rackley v. Matthews, 141 Fla. 307, 193 So. 69; Peters v. Bain, 133 U.S. 670, 10 S.Ct. 354, 33 L.Ed. 696; Ayers v. Fay, 187 Okl. 230, 102 P.2d 156; Roach v. Caraffa, 25 Pa. 22; Bogert on Trusts and Trustees, Vol. 1, § 206, p. 594; Id., Vol. 4, § 925, p. 2678; 65 C.J. pp. 972, 978; San Patricio County v. Shaw, Tex.Civ.App., 52 S.W.2d 334; Central Nat. Bank of Baltimore v. Connecticut Mutual Life Ins. Co., 104 U.S. 54, 55, 26 L.Ed. 693; Spencer v. Pettit, 17 S.W.2d 1102. The "evidence should be sufficient to produce belief in the minds of the jury that the property has been distinctly traced through all the mutations, but it need not place the question beyond dispute." 42 T.J. p. 743. Spencer v. Pettit, Tex.Com.App., 34 S.W.2d 798; Carl v. Settegast, Tex.Com.App., 237 S.W. 238; McCarty v. Hogan, Tex.Civ. App., 121 S.W.2d 499, 502. "* * * nor that any more than a fair preponderance of the evidence is required to determine the issue as in other civil cases." 42 T.J. p. 743. In Andrews v. Brown, Tex.Com. App., 10 S.W.2d 707, 709, citing authorities, it is reannounced, "If a man mixes trust funds with his own * * * the whole will be treated as trust property, except so far as he may be able to distinguish what is his own." Under the facts and circumstances of this record and the authorities above cited, we are not disposed to hold that the evidence was insufficient as a matter of law to support the jury's findings that 75% of the consideration paid in the purchase of the tracts here involved were out of the trust funds. In connection

with the conclusion just stated, it is thought that the judgment based on such findings is not without support in the pleadings as urged in the fifteenth and sixteenth assignments of error.

■ Special issues Nos. 7, 9 and 10 given by the court embraced all the facts, conditions and circumstances in this record, and included all the evidentiary facts embraced in the special requested issues Nos. 7 to 14, inclusive, which were refused by the trial court. A finding on any one of these requested issues, standing alone, would have furnished no basis upon which the percentage could have been calculated. Special issues Nos. 7, 9 and 10 each submitted an ultimate issue. The matters here complained of under points 12 to 22 do not present error.

■ The matter complained of under assignments of error 140 to 145, if error, was invited by defendants and are overruled. Whitehead v. Traders & General Ins. Co., Tex.Civ.App., 128 S.W.2d 429, 432; Associated Indemnity Corp. v. Scott, 5 Cir., 103 F.2d 203.

■ On all issues which submitted the provisions of Articles 5509, 5510, 5519 and 5526, R.C.S. of 1925, Vernon's Ann. Civ.St. arts. 5509, 5510, 5519, 5526, the jury made findings all favorable to plaintiff. The jury further found that George Eaton and those claiming under him had not claimed the land in controversy adversely to plaintiff and that in March 1937 she first learned of the claim she was asserting in the lawsuit. The assignments of error grouped under point 9, which attack the sufficiency of the evidence to support the jury's findings on the limitation issues, are overruled. If the testimony of George Eaton's brother was to be believed, then George Eaton recognized the existence of the alleged trust up to a month prior to his death in 1937, and up to that time had not repudiated same. The credibility of this and the other witnesses and the weight to be given such testimony were within the exclusive province of the jury. "The doctrine is elementary that the statute of limitations does not run against an express trust until the trustee has done some act which shows a repudiation of the trust, and which is brought to the knowledge of the cestui que trust." Brotherton v. Weathersby, 73 Tex. 471, 11 S.W. 505; Cole v. Noble, 63 Tex. 432; Home Inv. Co. v. Strange, 109 Tex. 342, 195 S.W. 849; Hand v. Errington, Tex.Com.App., 248 S. W. 25; Davis v. Davis, 20 Tex.Civ.App. 310, 49 S.W. 726, 729.

"No" was the answer to special issue No. A, reading: "Do you find from a preponderance of the evidence in this case that the defendants were claiming the moneys and personal property involved herein for more than two years prior to the institution of this suit?" Upon this finding, cross-plaintiffs in their appeal assert that they were entitled to a money judgment in twice the amount recovered by plaintiffs. The money judgment recovered by plaintiff represented ⅙ of ¾ or ⅛ of the proceeds from the sale of minerals produced from tracts Nos. 1 and 4.

■ Cross-plaintiffs lived in the community where this land was located, and had engaged in a lawsuit over other land formerly a part of their grandparents' estate. The jury found that each cross-plaintiff first learned in February 1931 of the claim they were asserting in their cross action filed in 1941. The jury found that defendants had claimed said land adversely to cross-plaintiffs and the latter knew of such adverse claims being asserted against them by defendants. The jury further found in favor of defendants as against cross-plaintiffs on the 5 year limitation statute, Article 5509, supra. No attack is made upon the sufficiency of the evidence to support these findings. Such findings prevented cross-plaintiffs a recovery of an interest in the land. It naturally follows that a failure to recover an interest in the land by reason of limitation applicable to the land would bar a recovery of the minerals, a part of the same land, and the proceeds arising from the sale thereof, and of oil produced therefrom, which is the "moneys and personal property" referred to in special issue No. A.

It is thought that the argument complained of under point 28 was no more than a reasonable deduction or observation from the evidence heard and observed by the jury during the trial. The argument complained of under points 29 and 30 is not susceptible of the criticism urged. We fail to see where the argument complained of under point 27 is referable to any issue in the case. All assignments not specifically mentioned have been considered and they are overruled.

■ The cross-assignments urged by plaintiff to the court's action in denying

her a recovery of an interest in tract No. 6 have not been accompanied by any reference to the record under which this court can ascertain the dealings which led up to or that surround the acquisition of this tract. Error not appearing, the action of the trial court in this respect is sustained.

It is without controversy that J. P. Eaton was served with a nonresident citation, a resident of Arkansas; and made no personal appearance, being represented by attorneys theretofore appointed by the court. Under such a situation, the trial court was without legal authority to render any money judgment against J. P. Eaton. Pennoyer v. Neff, 95 U.S. 714, 723, 24 L.Ed. 565, York v. State, 73 Tex. 651, 11 S.W. 869.

Accordingly, the judgment will be reformed so as to deny plaintiff any money judgment against the defendant J. P. Eaton; the money judgment awarded plaintiff will be reduced ⅛; and the judgment in all other respects will be affirmed.

Modified and affirmed.